# J. M. CROSLAND v. BOROUGH OF POTTSVILLE.

ERROR TO THE COURT OF COMMON PLEAS OF SCHUYLKILL
COUNTY.

Argued April 4, 1887—Decided May 27, 1889.
[To be reported.]

(*a*) The plaintiff, a lot-owner in a borough, gave to the owner of a lot across the street a license to carry off surface water by a covered drain-pipe, passing under the street and through the plaintiff's lot to a stream of water.

(*b*) The licensee, misusing the privilege, turned into the drain the foul matter from his cess-pool and privy vaults, to the injury of the dwelling-houses of the plaintiff, who thereupon disconnected the drain and stopped it at his curb line.

(*c*) The offensive matter then flowed into the street, when the borough authorities at the instance of the licensee re-connected the drain-pipe, turned the flow again into plaintiff's premises, and, the plaintiff resisting the workmen, caused his arrest and imprisonment in the lock-up.

1. When a person who is entitled to a limited right exercises it in excess, so as to produce a nuisance, it may be abated to the extent of the excess; but if the nuisance cannot be abated without obstructing the right altogether, the exercise of the right may be stopped entirely, until means have been taken to reduce it within its proper limits.

2. Creating no breach of the peace, the plaintiff had a right after due notice, to stop the flow through his premises; the borough authorities had no right to re-construct the drain and turn its contents again upon the plaintiff's property; and, in an action by the plaintiff against the borough to recover damages for the injury and for his arrest, it was error to instruct the jury to find for the defendant.

Before MERCUR, C. J., GORDON, TRUNKEY, GREEN and CLARK, JJ.

No. 301 January Term 1886, Sup. Ct.; court below, No. 262 November Term 1881, C. P.

On October 18, 1881, John M. Crosland brought case against the borough of Pottsville. The narr set out the ownership by the plaintiff of a certain messuage and premises in said borough and charged that the defendant borough had wrongfully caused and procured to be laid down immediately in front thereof certain drain-pipe by which large quantities of foul water, drainage from privies, as well as other drainage flowed

" down to, upon, against and into the said messuage and premises of the plaintiff," by reason whereof, etc. A second count charged that on October 17, 1881, the defendant, without having any reasonable or probable cause of action whatsoever against the plaintiff, did maliciously cause the plaintiff to be arrested, whilst he was seeking to avert the injury occasioned to his premises by the laying of said drain-pipe, and did wrongfully cause the plaintiff to be " thrown into the lock-up and kept and detained there for the space of a half hour," etc., by reason whereof, etc. The plea was, not guilty.

At the trial on December 9, 1884, the plaintiff introduced testimony which, as he claimed, established the following facts:

In 1872, D. P. Brown, who owned real estate on the west side of Centre street, in the borough of Pottsville, asked and obtained permission from Crosland, who was in possession under a ground-rent lease of a plot of ground, about 150 feet below Brown's, but on the east side of the street, to run a drain to drain his surface water, only, through the latter's premises, to the Schuylkill river; that no sooner had Brown by leave of the borough authorities constructed his drain, down, through and crossing Centre street, the main thoroughfare of the borough, and through Crosland's premises, than he not only connected the same with an old coal shaft or abandoned mine working, about forty feet deep, that he was using as a cess-pool, but also sold rights to other inhabitants and property owners in his neighborhood, to connect their drains with the one so constructed by him.

Crosland subsequently built a row of frame dwelling-houses on his premises, numbered respectively 536, 538, 540 and 542; Brown's drain running directly through the basement or cellar of No. 538. These dwellings were rented from time to time by Crosland, and occupied by his tenants. As early as 1875, Crosland discovered that instead of the drain being used for drainage of surface water, only, as agreed upon between him and Brown, it was used as a sewer or drain for Brown's cesspool, and also as a drain for Brown's neighbors. The Pennsylvania Diamond Drill Company, whose shop was on the rear of Crosland's lot first made complaint, and in 1878, threatened to remove their works or to withhold the rent, unless the nuisance created by this cess-pool sewage coming down by their shop,

was abated. The tenants of the dwellings also made complaint, and on May 26, 1880, after Crosland had exhausted every remedy known to him, to disinfect his dwellings and make them habitable, and after having verbally notified Brown, he served a written notice on Brown to cut off and remove his drain or sewer altogether. Brown paid no attention to these notices.

Crosland's dwellings became permeated with noisome sewage and cess-pool smells from this drain, unhealthy and uninhabitable. In April, 1881, a child of Hadesty, the tenant of No. 540, died. On May 10th, following, a child of Norfsinger, tenant of No. 536, took sick and died. In May and June the families in Nos. 538 and 542 were sick with scarlet fever, and all the houses excepting No. 538, were subsequently deserted.

On May 10 or 13, 1881, almost a year after the first, and six weeks after the second, notice to Brown, Crosland dug down about eleven feet from the curb-stone, on the west side of the street, and disconnected the pipe that led into his premises, secured the disconnected ends by plugging them tightly, and mailed Brown a notice of what had been done. The result of this was, that the water or sewage thereafter oozed or was forced up on the street at the point where Crosland had disconnected the pipe. It remained in this condition until August 25, 1881, when the borough, at the instance and in pursuance of notice from Brown, first appeared on the scene. On that day, Crosland being absent, the chief burgess, Joseph Derr, and supervisor Dewald, took possession of the drain, opened it up at the point where Crosland had disconnected it, put in new pipe re-connecting it with Crosland's property. Two days after, August 25, 1881, Crosland again cut off the connection at the curb-stone, and plugged the pipes. Nothing further was attempted by defendant until October 17, 1881, when employees of the borough dug up the drain and re-connected the same with Crosland's premises. Crosland was present and resisted the invasion of his rights, as he claimed the proceeding to be, when he was arrested by the police and conveyed to the common " lock-up."

At the close of the case upon both sides, the court, PERSHING, P. J., after reviewing the testimony charged the jury:

The undisputed testimony on both sides is, that after this

drain was plugged up the water came out upon the street and flowed down the street, to the extent related; some of the witnesses say it was dangerous to animals, and other witnesses, including Dr. Bland, say it was dangerous to health. You have heard the same thing from all those witnesses, showing the bad condition of the street, and the odor that some of them testify to, proceeding from the matter upon the street, as to which there is no difference of opinion. Many of the witnesses thought it created a public nuisance.

It also appears that the borough authorities were notified repeatedly that they should abate the nuisance, and clear the street of this foul matter which it appeared was flowing down the street, to the nuisance and injury of the neighborhood, making it dangerous for men and beasts that had to travel upon it. We find that the borough did, as I have already said, on the 23d of August, 1881, proceed there and re-open the drain; that after it had been closed again on the 25th of August, they again went there on the 17th of October, and there is no dispute that they again opened the drain. They had to put in new pipe to make the connection which had existed before. It was at this time that the difficulty took place between the borough authorities and Mr. Crosland, which resulted in his being arrested and taken to the lock-up and detained there, according to the officer who arrested him, some twenty minutes. In Crosland's absence, the hole which had been dug in the street for the purpose of connecting the pipe again, was filled up, and he proceeded on the next morning to again plug it up. It would seem from the testimony on both sides that the overflow of water on the street resulted from the closing or cutting off of the flow of water through the pipes through Mr. Crosland's premises.

It has been argued to the court that whilst the general rule for damages is compensation, that which will make the party injured whole, yet, where there are circumstances of aggravation charged, or oppression, the jury may go beyond that and give vindictive or punitive damages, damages which amount to a punishment. No doubt that is the general rule of law. It has been held, however, in a controversy very similar to this, Elliott v. Philadelphia, 75 Pa. 347, for the alleged unlawful act of its public officer in making an arrest in connection with

Charge of Court below.

the running off of a horse, that where a city only authorizes a
lawful act, to be done in a lawful manner, it is not responsible
for the acts of its officers outside of their authority.   If there
was anything illegal in the arrest of Mr. Crosland, he would
have a personal action against the party who illegally arrested
him.   It would be a personal action, not for an injury to real
estate.   He could have an action in a different form for any
injury done to his real estate.   I do not think it is very material
to dwell upon that.   Mr. Shaw's evidence was, that he was
instructed by the borough officers (of course the borough would
be bound by anything done in pursuance of its own instruction),
that, if Mr. Crosland interfered with the men in making the con-
nection of the pipes, he should arrest him.   There is nothing
in that that would authorize an illegal arrest, so as to make the
borough responsible for that illegal arrest.   It might very well
mean, a legal arrest.   If there was anything illegal in it, the
officer, the person who did it, would be the party liable, if any
damages were sustained, for the illegal arrest.   These are the
rules of law which govern cases of this kind.

The borough is charged with the control of the streets, and
is bound to keep them in proper repair; and, as counsel for
plaintiff has said in your hearing, if the borough fail to keep
the streets in repair, so that they become a nuisance for people
living along them, or for the people generally who travel---
because every man in the commonwealth has a right to travel
them—if they become a nuisance to the neighborhood, danger-
ous to the people of the neighborhood, and to travelers, the
borough officers could be indicted and punished for neglect to
put the streets in proper repair and make them safe, and pre-
vent noisome smells, or whatever would be injurious to health,
from being encountered by persons who have a right to travel
the streets.

It is claimed here, that all the borough did was what they
had a right to do, and what they were compelled by law to do, in
order to carry out the duties the officers owed to the borough
and to the community.   It is alleged here by the plaintiff, that
the claim for damage is not for the condition of the street, nor
in consequence of the flow of foul water on the street, as I
understand counsel to state, but because the borough turned
this water, as they claim, upon Mr. Crosland.   [Mr. Crosland,

Charge of Court below.

whatever his grievance may have been against those who injured him by turning foul water upon him, if that is the fact; whatever right he might have to sue Colonel Brown, if Colonel Brown violated his contract with him, he would not have any more right to plug up the pipes, so as to throw foul water on the streets, than he would have to pump it from a reservoir on to the street, if he had a reservoir of that kind on his premises. It is the thing done, and not the way it is done. I therefore cannot see, it is not made plain, how he could set up a claim against the borough for the condition of the street, when that was brought about in consequence of his own act, in trying to cut off the water from his own premises.] [1]

[Now, upon the other points, we say that there is no evidence in our judgment here, to show that Mr. Crosland sustained any damages by the connecting of these pipes on the 23d of August, and the 17th of October. The evidence has not shown what the damages were that he did sustain. It is not claimed that his property was entered, that his house was entered, or that any actual damage was done to his real estate. If such were done, it is not shown here, and it is the duty of the party claiming damages to show what the damages are, and the extent of those damages. It seems to me, that there is an absence of evidence here for the jury to found a verdict upon.] [2]

[Another view we take of it is, that this water having been turned on the street by Mr. Crosland, thus constituting a nuisance, the borough authorities had a right to restore the street to the condition in which it was before he plugged up the pipes and thus threw the water upon it; and, in the exercise of their rights over the streets of the borough, finding them in this condition, and knowing the cause, they had a right to make the connection of the pipes, simply to restore the street to the condition it was in before it was interfered with by Crosland; not for the purpose of throwing water upon him, but to put the street in proper condition, the same condition in which it was at the time that he first interfered with it by turning the water upon it, by closing up the pipes.] [3] I find the case of Martin v. Riddle, 26 Pa. 415, sustains the view I had come to on this subject during the argument yesterday.

[In view of the complaints, in view of the undisputed condition of that street, it was the bounden duty of the borough

Charge of Court below.

to abate the nuisance, and they had the right to put the street in just the condition it was before the nuisance was created, by plugging up these pipes, although the effect of that was to throw the water where it had been before, where Mr. Crosland, by his agreement with Brown, agreed it should be, on his premises.] 4

The dispute was whether Brown had sent the kind of water there that he agreed to send, or whether he sent other kinds of water. That is a matter between Crosland and Brown. The borough sent no foul water, under this arrangement of the pipes. They were no party to it whatever.

[The view we take of it is, that the borough was there in the exercise of a lawful right. There is no evidence here that it exercised it in any other than a lawful manner. So far as any alleged injury to real estate is concerned, they are therefore not responsible in this action for damages.] 5 Any other conclusion, it would seem to me, would put the streets under the control of any man through whose premises water ran, and who thought it injured him possibly, and who chose to turn the water upon the streets and create a nuisance. In such case, if the borough could not restore the street to the condition it was in prior to the creation of the nuisance, it would result that they would have to devise some means to abate it, perhaps at very large expense, every time a citizen saw proper to create a public nuisance on the street. I do not think the borough is bound to do that at all.

[I think Mr. Crosland has mistaken his remedy, mistaken the party who is liable to him, if he has been injured in consequence of this overflow of water.] 6 We all understand what injury may be done to a man's property by a foul cess-pool smell. There is no one here to deny that Mr. Crosland may have been injured if this sort of water was sent on his premises in violation of his contract with Brown. But the question is, what has the borough done to him which gives him a right to claim damages from the borough? [The borough has done nothing more, as we view it, than to put the street in the same condition that it was in before Crosland interfered with it, by closing up the drain causing the nuisance.] 7

[Upon the whole evidence in the case, we find no disputed question of fact to submit to you; your verdict will therefore be for the defendant.] 8

That will put this matter in the very best position to correct us if we are wrong.

The jury returned a verdict for the defendant, as directed. A rule for a new trial having been discharged, the plaintiff took this writ, assigning as errors:

1–8. The portions of the charge embraced in [ ] [1 to 8]

*Mr. J. W. Moyer* (with him *Mr. John W. Ryon* and *Mr. W. F. Shepherd*), for the plaintiff in error:

1. At common law, whatever unlawfully annoys or doth damage to another is a nuisance; and such nuisance may be abated, that is, taken away or removed, by the party aggrieved thereby, so as he commits no riot in the doing of it. And the reason why the law allows this private and summary method of doing one's self justice, is, because injustice of this kind, which obstructs or annoys such things as are of daily convenience and use, requires an immediate remedy, and cannot wait for the slow progress of the ordinary forms of justice: 3 Bl. Com. 5, 6. A private nuisance of the worst character existed here. Why had not the plaintiff the right to abate it? It is claimed that it was the result of his agreement with Brown. But his agreement with Brown was nothing more than a permission to Brown to drain his surface water. As between plaintiff and Brown, as well as between himself and defendant, the plaintiff clearly had the right, after due notice, to abate the nuisance, regardless of the effect on Brown's premises.

2. The right of the defendant to remove or abate nuisances was not in question in this case. It was conceded they had the right in a proper case and in a proper manner. It may even be conceded that they had the right to do so in this case. But it is strenuously denied that they had the legal right or power, in their abatement of the alleged nuisance, to turn it again on plaintiff in error. That act was both illegal and unnecessary. It could not be justified on the ground of necessity, nor did defendant in error claim to do so. In Haugh's App., 102 Pa. 44, Judge GORDON says: "The plea of necessity fails to justify any act of this kind, for the proposition that one man should, under any circumstances, be permitted to deposit any part of his health-destroying filth on his neighbor's premises, is simply absurd."

Arguments.

3. A municipal corporation derives all its power from the legislature. It may do any act which it is authorized to do within the constitutional exercise of its powers, and all acts that are fairly and legitimately incident to the powers granted. But it cannot lawfully go beyond that point. It takes nothing by implication, except such powers as are fairly and legitimately within the letter and spirit of the grant. The fact that the public good, or the welfare of the corporation, requires that certain acts should be done, does not warrant their being done unless they come within the scope of the powers delegated. The charter and special acts in addition thereto, if there be any, are the measure of its powers, and when it exceeds those powers, its acts are unwarranted, unlawful, and afford no protection whatever to those acting under them: Wood on Nuisances, §§ 738, 771 ; Clark v. Syracuse, 13 Barb. 32 ; Kirk v. Nowill, 1 T. R. 124 ; Manhattan Co. v. Van Comes, 23 N. J. 255 ; Balt. & P. R. Co. v. Baptist Church, 108 U. S. 317.

4. Municipal corporations have invariably been held liable for damages occasioned by acts resulting in the creation of public or private nuisances, or for an unlawful entry upon the premises of another, whereby injury to his property had been occasioned : Balt. & Pot. R. Co. v. Baptist Church, 108 U. S. 317. This principle has been uniformly applied to the acts of such corporations in constructing streets, sewers, drains and gutters, whereby the surface water of a large territory which did not naturally flow in that direction, was gathered into a body and thus precipitated upon the premises of an individual, occasioning damages thereto : Byrnes v. Cohoes, 67 N. Y. 204; Bartable v. Syracuse, 8 Hun 587 ; s. c. 72 N. Y. 64 ; Noonan v. Albany, 79 N. Y. 475 (35 Am. Rep. 540); Beach v. Elmyra, 22 Hun 158 ; Field v. West Orange, 36 N. J. Eq. 120 ; Philadelphia v. Collins, 68 Pa. 122.

5. When the borough forcibly re-connected the drain-pipe, if that act can be justified, it practically to that extent confiscated his property for that purpose. If a public nuisance existed on the street, as alleged, the borough had the right, and it was their duty to abate it ; but to abate it in a legal manner, and it could not legally, forcibly, seize private property, as it did in this case, for that purpose. True it is, it may require both property and money to carry out its plans and make im-

provements, but if so, it must acquire both in the manner pointed out by law, as other people do. It cannot simply seize them wherever they are most convenient and forcibly appropriate them to their own use, as was done in this case, without making just compensation therefor : §·8, article XVI. of the constitution ; Seifert v. Brooklyn, 2 Cent. R. 135 ; Radcliff v. Mayor, 4 N. Y. 195 (53 Am. Dec. 357) ; Dillon on Mun. Corp., § 1051.

*Mr. R. H. Koch*, for the defendant in error :

1. In view of § 4, act of February 19, 1828, P. L. 100, incorporating the borough of Pottsville, and of § 7, of the amendatory act of April 4, 1831, P. L. 439, there can be no doubt of the right of the borough to remove a nuisance and improve a street. When the authorities discovered that this nuisance resulted from a disconnected drain, they had the direct cause thereof, and were not bound to seek the remote cause ; for, to reach that would have taken them on private property where they had no right. To abate the nuisance required the reconstruction of the severed drain-pipe, which, as far as the borough was concerned, was the natural water course, and became such by the act of the plaintiff himself. He cannot visit the evil effects of his own act upon the borough, and for the injury done by Brown and others he must seek redress against them, and not against the borough : Martin v. Riddle, 26 Pa. 415.

2. In the case of Butler Borough's App., 1 Cent. R. 594, the pipes of the gas company became leaky, and the gas escaping from them was dangerous to the lives and health of the inhabitants of the town. The town council directed the high constable to break connection between the gas well and the distributing pipes where they entered the town. The gas company obtained an injunction restraining the proposed action of the borough, the application of the borough authorities was denied and they appealed. This court, in a per curiam opinion, said : " We think the learned judge erred in refusing to dissolve this preliminary injunction. If the final hearing shall establish, what appears now to be presumptively shown, that there is a dangerous and offensive nuisance in the public streets of said borough, the municipality has power to prohibit its continuance."

OPINION, MR. JUSTICE CLARK:

After the argument of this case, it was assigned to our late brother TRUNKEY for an opinion. After his death, the reassignment of it was overlooked and hence the delay in entering judgment.

We will not enter into any extended discussion of the case, but will briefly state the grounds for the judgment we now enter. As the jury received binding instructions to find for the defendant, the testimony adduced by the plaintiff, with all reasonable inferences to be drawn therefrom, must be taken as establishing the true theory of the case on the facts.

We assume, therefore, that Crosland gave to Col. Brown the right to conduct the surface water only from his premises through this drain into the Schuylkill river; that after the drain pipes were put down he turned into it the foul matter which came from his cess-pool and privy vaults, and that he sold a similar privilege to others; that thereby the drain instead of being used to conduct the surface and mountain water, as originally intended, was converted into a common sewer which caused the plaintiff's house to be untenantable and it is believed unhealthy, and thus became a nuisance which the plaintiff claimed the right to abate. There is testimony also that the privilege given to Brown was experimental merely; if it should prove unsatisfactory, Crosland says, he had the right at any time to terminate it. The privilege must be treated, therefore, as a mere license which it was in Crosland's power to revoke at his pleasure. It must be assumed also that the persons who were employed to adjust these pipes, and who reconstructed the sewer so as to again throw its contents upon the plaintiff's premises, were acting under authority from the borough and were directed to do just what was done, and that the borough was responsible for these acts. There is abundant testimony to justify this inference, no matter what the facts may have been.

The drain was put down by Brown, for his own convenience; the borough had nothing to do with it, but as it was laid in the street and suffered to remain and the borough exercised its authority to maintain it, we may infer that it was originally placed there by permission, or that its construction was afterwards assented to. Nor had Crosland anything to do with the drain, beyond yielding his assent that it might be laid in his

lots, to lead from the street to the river, and to conduct the surface water. It conferred only a limited right.

When a person who is entitled to a limited right exercises it in excess, so as to produce a nuisance, it may be abated to the extent of the excess: Barclay v. Commonwealth, 25 Pa. 503; Taggart v. Commonwealth, 21 Pa. 527. But if the nuisance cannot be abated without obstructing the right altogether, the exercise of the right may be entirely stopped, until means have been taken to reduce it within its proper limits: Wood on Nuisances, 804; Addison on Torts, 269; Cawkwell v. Russell, 26 L. J. Exch. 34; Beard v. Murphy, 37 Vt. 99. If Brown abused the privileges which had been given him, by using these pipes as a channel for noxious and offensive matter, instead of surface water, and thereby created a nuisance, Crosland had an undoubted right, after due notice, to go either upon the premises of Brown, or on his own premises, and abate the nuisance by stopping up the drain, thereby preventing even the surface water from flowing therein, until Brown reduced his use thereof within the proper limits. Of course a person who undertakes to abate a nuisance, proceeds at his peril; he takes the risk of being able to show that the thing complained of was in fact a nuisance. If he errs in judgment, he is answerable in damages, and if a breach of the peace is involved, he is liable to indictment for the result.

But, creating no breach of the peace, he had a right to abate this nuisance. The noxious matter which passed through the drain under the road, came from Brown's premises; it was his (Brown's) duty to convey it to the river, or to some other place where it would not become offensive and injurious to the public, and when he received notice that the drain was obstructed, it was his duty to stop the flow. It was not an unlawful obstruction of the drain which caused the public nuisance, it was the continued use of the drain by Brown after he knew it was obstructed, that caused the overflow into and upon the highway, and for this Brown was responsible. Brown's recourse, if he had any, was upon Crosland; he had no right to discharge the sewer into the street. The borough authorities of Pottsville had no more right to open up the sewer through Crosland's property than Brown had; their attempt to do so was wholly without authority, and in denial of the

legal rights of Crosland, who had a clear right in a lawful and peaceable manner to protect his property against the unlawful use of this drain by Brown, and against the unlawful acts of any other person who might come to aid in perpetrating this wrong upon him. Brown was the offending party and the officers of the borough should have given their attention to him; they should have obliged him to abate the public nuisance which he had set up and was steadily maintaining.

We decide this case upon the force and effect of the plaintiff's testimony, adopting his theory of the case as the correct one. When it comes to be tried again, and the evidence on both sides is submitted to the jury, the case may be presented in an entirely different light. The court erred, we think, in submitting the case to the jury with binding instructions to find for the defendant.

The judgment is reversed and a venire facias de novo awarded.